**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

COLAKOGLU METALURJI A.S. and COLAKOGLU DIS TICARET A.S.,

*Plaintiffs,*

v.

THE UNITED STATES,

*Defendant,*

and

REBAR TRADE ACTION COALITION,

*Defendant-Intervenor.*

Court No. 1:26-cv-02934-TMR

**ORDER**

Upon consideration of the motion of Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. ("Çolakoğlu") for Judgment upon the agency record pursuant to USCIT Rule 56.2, and upon consideration of all other papers and proceedings herein, it is hereby

**ORDERED** that the motion of Çolakoğlu is granted; and it is further

**ORDERED** that, on remand, the U.S. Department of Commerce ("Commerce") is instructed to reconsider (a) the limitation of Çolakoğlu's duty drawback adjustment to IPCs closed during the POR; (b) the inconsistent treatment of IPCs in the sales-side and cost-side duty drawback adjustments; (c) the categorization of two of Çolakoğlu's accounts in calculating Medtrade's ISE ratio; (d) the date of sale for Çolakoğlu's U.S. sales; and (e) Commerce's unexplained departure from previous administrative reviews in calculating an aberrational margin for Çolakoğlu; and it is further

**ORDERED** that, on remand, Commerce is instructed to reconsider the antidumping duty rate applied Çolakoğlu based on any changes to its re-consideration of the duty drawback adjustments, recalculation of Medtrade's ISE ratio, date of sale for Çolakoğlu's U.S. sales during the POR, and its calculation of Çolakoğlu's margin as compared to the margins Commerce calculated in prior segments of this proceeding.

**SO ORDERED**.

Date: ________________________, 2027
New York, New York

___________________________________
Timothy M. Reif, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| COLAKOGLU METALURJI A.S. and COLAKOGLU DIS TICARET A.S., *Plaintiffs,* | |
| v. | |
| THE UNITED STATES, *Defendant,* | Court No. 1:26-cv-02934-TMR |
| and | |
| REBAR TRADE ACTION COALITION, *Defendant-Intervenor.* | |

**PLAINTIFFS ÇOLAKOĞLU METALURJI A.S.'S and ÇOLAKOĞLU DIS TICARET A.S.'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. (collectively "Çolakoğlu") respectfully move this Court, pursuant to Rule 56.2 of the U.S. Court of International Trade, for an Order granting its Motion for Judgment on the Agency Record.

This motion challenges certain issues decided by the U.S. Department of Commerce ("Commerce") in the 2023-2024 administrative review of the antidumping duty order on *Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the Antidumping Duty Administrative Review; 2023–2024,* 91 Fed. Reg. 17246 (Dep't Commerce Apr. 6, 2026) ("*Final Results*"), ECF No. 19-5, P.R. 6. Commerce's factual and legal conclusions underlying the *Final Results* are set forth in its Issues and Decision Memorandum. Memorandum from E. Eastwood to C. Abbott, Re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty

Administrative Review Antidumping duty of Steel Concrete Reinforcing Bar from the Republic of Türkiye; 2023-2024 (Mar. 30, 2026), ECF No. 19-4, P.R. 7.

For the reasons more fully set forth in the accompanying brief, Çolakoğlu respectfully requests that the Court reverse the challenged determination of Commerce and remand with instructions for Commerce to reconsider: (1) its decision to limit Çolakoğlu's sales-side duty drawback adjustment to inward processing certificates ("IPCs") that closed during the POR; (2) its decision to exclude closed IPCs from the sales-side duty drawback adjustment while including the same IPCs in the cost-side adjustment; (3) its categorization of two of Çolakoğlu's accounts and the resulting recalculation of Medtrade Inc.'s ("Medtrade") indirect selling expense ("ISE") ratio; (4) its decision to use invoice or shipment date, rather than contract date, as the date of sale for Çolakoğlu's U.S. sales; and (5) its arbitrary calculation of Çolakoğlu's margin, which is unreasonably higher than the margins Commerce calculated in prior segments of this proceeding, without adequate reasoning or evidentiary support.

For all the reasons above and as discussed more fully in Çolakoğlu's brief accompanying this motion, Çolakoğlu respectfully moves this Court to

1. Hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law with respect to (a) the limitation of Çolakoğlu's duty drawback adjustment to IPCs closed during the POR; (b) the inconsistent treatment of IPCs in the sales-side and cost-side duty drawback adjustments; (c) the categorization of two of Çolakoğlu's accounts in calculating Medtrade's ISE ratio; and (d) the date of sale for Çolakoğlu's U.S. sales;

2. Remand the *Final Results* to Commerce with instructions to reconsider each of these issues consistent with the Court's opinion and to recalculate Çolakoğlu's antidumping duty margin as appropriate; and

3. Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Jessica R. DiPietro**
Jessica R. DiPietro
Leah N. Scarpelli
Matthew M. Nolan
Tyler J. Kimberly
Chelsea J. Burkhart

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 350-3622

November 10, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| ÇOLAKOĞLU METALURJI A.S. and ÇOLAKOĞLU DIS TICARET A.S., *Plaintiffs*, | **NON-CONFIDENTIAL VERSION** |
| v. | |
| THE UNITED STATES, *Defendant*, | Court No. 1:26-cv-02934-TMR |
| and | **Business Proprietary Information Deleted from Pages: 6, 7, 13, 15, 16, 26 – 30.** |
| REBAR TRADE ACTION COALITION, *Defendant-Intervenor*. | |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Jessica R. DiPietro
Leah N. Scarpelli
Matthew M. Nolan
Tyler J. Kimberly
Chelsea J. Burkhart

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 350-3622
E-mail: jessica.dipietro@afslaw.com

*Counsel for Çolakoğlu Metalurji A.S. & Çolakoğlu Dis Ticaret A.S.*

November 10, 2026

# TABLE OF CONTENTS

I. RULE 56.2 STATEMENT ........................................................ 1

II. ISSUES PRESENTED........................................................ 2

A. Whether Commerce Reasonably and Lawfully Limited Çolakoğlu's Duty Drawback Adjustment to Certain IPCs that "Closed" During the POR. ............... 2

B. Whether Commerce Reasonably and Lawfully Excluded Closed IPCs from Çolakoğlu's Sales-Side Duty Drawback Adjustment While Including the Same IPCs in the Cost-Side Duty Drawback Adjustment. ............................. 3

C. Whether Commerce Reasonably and Lawfully Categorized Two of Çolakoğlu's Accounts Resulting in the Subsequent Recalculation of Medtrade's ISE Ratio........................................................ 3

D. Whether Commerce Reasonably and Lawfully Refused to Rely on the Date of Sale as Reported by Çolakoğlu Based on Contract Date and Used Shipment or Invoice Date for Çolakoğlu's U.S. Sales......................................... 4

E. Whether Commerce Complied with Its Statutory Mandate to Calculate an Accurate Dumping Margin for Çolakoğlu. ......................................................... 4

III. STATEMENT OF FACTS ........................................................ 5

IV. STANDARD OF REVIEW ........................................................ 8

V. SUMMARY OF ARGUMENT ........................................................ 10

VI. ARGUMENT........................................................ 11

A. Commerce Unreasonably and Unlawfully Limited Çolakoğlu's Sales-Side Duty Drawback Adjustment to Certain IPCs That "Closed" During the POR........................................................ 11

1. The Record Evidence Supports a Duty Drawback for All Closed IPCs Reported During the Review......................................................... 15

2. Commerce's Decision to Exclude Certain IPCs Unreasonably Ignores Agency Practice and Court Precedent Raised by Plaintiffs........ 17

B. Commerce Unreasonably and Unlawfully Excluded Reported IPCs from Çolakoğlu's Sales-Side Duty Drawback Adjustment but Calculated the Cost-Side Duty Drawback Adjustment Based on All IPCs Çolakoğlu Used During the POR........................................................ 25

C. Commerce Unreasonably and Unlawfully Categorized Two of Çolakoğlu's Accounts Resulting in the Subsequent Recalculation of Medtrade's ISE Ratio........................................................ 27

D. Commerce Unreasonably and Unlawfully Did Not Use the Date of Sale as Reported by Çolakoğlu Based on Contract Date and Primarily Used Shipment or Invoice Date for Çolakoğlu's U.S. Sales....................................... 31

E. Commerce Acted Contrary to its Statutory Mandate to Calculate an Accurate Dumping Margin for Çolakoğlu. ........ 34

VII. CONCLUSION ........ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allied Tube & Conduit Corp. v. United States*,
127 F.Supp.2d 207 (Ct. Int'l Trade 2000) ....................31

*Am. Kitchen Cabinet All. v. United States*,
745 F.Supp.3d 1270 (Ct. Int'l Trade 2024) ....................14

*Am. Kitchen Cabinet All. v. United States*,
803 F.Supp.3d 1231 (Ct. Int'l Trade 2025), *appeal docketed*, No. 26-1977
(Fed. Cir. June 26, 2026) ....................14

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,
624 F.Supp.3d 1343 (Ct. Int'l Trade 2023) ....................21

*Assan Aluminiyum Sanayi ve Ticaret A.S. v. United States*,
No. 21-00246, 2026 WL 1747091 (Ct. Int'l Trade June 17, 2026) ....................12, 13, 23, 24

*Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States Aluminum Ass'n Trade Enf't Working Grp.*,
No. 21-00616, 2024 WL 2044061 (Ct. Int'l Trade May 8, 2024)
....................6

*Bowman Transp., Inc. v. Ark-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ....................34, 36

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) ....................9

*Calgon Carbon Corp. v. United States*,
487 F.Supp.3d 1359 (Ct. Int'l Trade 2020) ....................18, 30

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012) ....................9

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ....................9

*DAK Americas LLC v. United States*,
456 F.Supp.3d 1340 (Ct. Int'l Trade 2020) ....................36

*DuPont Teijin Films USA, LP v. United States*,
407 F.3d 1211 (Fed. Cir. 2005) ....................9

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*,
308 F.Supp.3d 1297 (Ct. Int'l Trade 2018) ....................32

*Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*,
357 F.Supp.3d 1325 (Ct. Int'l Trade 2018) ....................25

*Fla. Citrus Mut. v. United States*,
515 F.Supp.2d 1324 (Ct. Int'l Trade 2007), *aff'd*, 550 F.3d 1105 (Fed. Cir. 2008) ....................29

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)....................29

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*,
413 F.Supp.3d 1347 (Ct. Int'l Trade 2019) ....................30

*Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.Ş. v. United States*,
439 F.Supp.3d 1342 (Ct. Int'l Trade 2020) ....................21, 23

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
654 F.Supp.3d 1311 (Ct. Int'l Trade 2023) ....................12, 16, 21, 22

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
756 F.Supp.3d 1312 (Ct. Int'l Trade 2025), *appeal docketed*, No. 25-1559 (Fed. Cir. Mar. 19, 2025) ....................32

*Katunich v. Donovan*,
599 F.Supp. 985 (Ct. Int'l Trade 1984) ....................18

*Maverick Tube Corp. v. Tosçelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1273 (Fed. Cir. 2017)....................26

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017)....................9

*Mid Continent Steel & Wire, Inc. v. United States*,
551 F.Supp.3d 1360 (Ct. Int'l Trade 2021) ....................30

*Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................9, 14

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)....................9

*NLRB v. CNN Am., Inc.*,
865 F.3d 740 (D.C. Cir. 2017) ....................18

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995)....................9, 31

*Nucor Corp. v. United States*,
612 F.Supp.2d 1264 (Ct. Int'l Trade 2009) ....................31

*Parkdale Int'l v. United States*,
475 F.3d 1375 (Fed. Cir. 2007)....................34

*PT. Zinus Glob. Indon. v. United States*,
762 F.Supp.3d 1257 (Ct. Int'l Trade 2025), *appeal docketed*, No. 25-1674
(Fed. Cir. Apr. 22, 2025)....................25, 30

*Ramaprakash v. F.A.A.*,
346 F.3d 1121 (D.C. Cir. 2003) ....................18

*Rhone-Poulenc, Inc. v. United States*,
927 F.Supp.451 (Ct. Int'l Trade 1996) ....................10

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
635 F.3d 1335 (Fed. Cir. 2011).................... *passim*

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)....................18, 25, 36

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1994)....................36

*Solarworld Ams., Inc. v. United States*,
182 F.Supp.3d 1372 (Ct. Int'l Trade 2016) ....................30

*Tosçelik Profil ve Sac Endüstrisi A.S. v. United States*,
256 F.Supp.3d 1260 (Ct. Int'l Trade 2017) ....................32

*Tosçelik Profil ve Sac Endüstrisi A.Ş. v. United States*,
321 F.Supp.3d 1270 (Ct. Int'l Trade 2018) ....................15, 21

*Tosçelik Profil ve Sac Endüstrisi A.Ş. v. United States*,
348 F.Supp.3d 1321 (Ct. Int'l Trade 2018) ....................17, 21, 22, 23

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) ....................18

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....................29

*Uttam Galva Steels Ltd. v. United States*,
311 F.Supp.3d 1345 (Ct. Int'l Trade 2018) ....................26

*Uttam Galva Steels Ltd. v. United States*,
416 F.Supp.3d 1402 (Ct. Int'l Trade 2019), *aff'd*, 997 F.3d 1192 (Fed. Cir. 2021) ....26

*Uttam Galva Steels Ltd. v. United States*,
997 F.3d 1192 (Fed. Cir. 2021)....12, 21, 26

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013)....24

*Zhejiang DunAn Hetian Metal Co. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011)....14

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....9

19 U.S.C. § 1677a(a)....31

19 U.S.C. § 1677a(c)....4

19 U.S.C. § 1677a(c)(1)(B)....12, 26

**Regulations**

19 C.F.R. § 351.401(i) ....31

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27349 (Dep't Commerce May 19, 1997) (final rule) ....31, 32

**Administrative Determinations**

*Aluminum Extrusions From the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 80512 (Dep't Commerce Oct. 3, 2024), and accompanying Issues and Decision Memorandum....12, 19, 20

*Certain Aluminum Foil From the Republic of Türkiye: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 21896 (Dep't Commerce May 22, 2025), and accompanying Issues and Decision Memorandum ....19, 20

*Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42216 (Dep't Commerce Aug. 29, 2025), and accompanying Issues and Decision Memorandum ....18

*Common Alloy Aluminum Sheet From the Republic of Türkiye: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 89965 (Dep't Commerce Nov. 14, 2024), and accompanying Issues and Decision Memorandum....19

*Notice of Final Determination of Sales at Less Than Fair Value: Carbon and Certain Alloy Steel Wire Rod from Mexico*, 67 Fed. Reg. 55800 (Dep't Commerce Aug. 30, 2002), accompanying Issues and Decision Memorandum ....20, 21

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 23192 (Dep't Commerce May 22, 2017) ....35

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 15765 (Dep't Commerce Mar. 19, 2020)....35

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of the Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 89663 (Dep't Commerce Dec. 28, 2023)....35

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021) ....35

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No-Shipments; 2019-2020*, 87 Fed. Reg. 7118 (Dep't Commerce Feb. 8, 2022)....35

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No-Shipments; 2019-2020; Correction*, 87 Fed. Reg. 10334 (Dep't Commerce Feb. 24, 2022) ....35

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023), and accompanying Issues and Decision Memorandum....26, 35

*Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 21275 (Dep't Commerce May 19, 2025)....35

*Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 17246 (Dep't Commerce Apr. 6, 2026), and accompanying Issues and Decision Memorandum .... *passim*

*Steel Concrete Reinforcing Bar From the Republic of Türkiye: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 66350 (Dep't Commerce Aug. 15, 2024), accompanying Preliminary Decision Memorandum ....................19, 20

*Steel Concrete Reinforcing Bar from the Republic of Türkiye: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023–2024*, 90 Fed. Reg. 38743 (Dep't Commerce Aug. 12, 2025), and accompanying Preliminary Decision Memorandum ....................7, 26

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| ÇOLAKOĞLU METALURJI A.S. and ÇOLAKOĞLU DIS TICARET A.S., | |
| *Plaintiffs,* | **NON-CONFIDENTIAL VERSION** |
| v. | |
| THE UNITED STATES, | Court No. 1:26-cv-02934-TMR |
| *Defendant,* | |
| and | **Business Proprietary Information Deleted from Pages: 6, 7, 13, 15, 16, 26 – 30.** |
| REBAR TRADE ACTION COALITION, | |
| *Defendant-Intervenor.* | |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

## I. RULE 56.2 STATEMENT

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. ("Çolakoğlu" or "Plaintiffs"), foreign manufacturers and foreign exporters of steel concrete reinforcing bar ("rebar") from Türkiye, hereby submit this memorandum of points and authorities in support of their motion for judgment on the agency record and challenge the final affirmative determination as set forth below.

This is an appeal from the final results in the 2023-2024 administrative review of the antidumping duty order on *Steel Concrete Reinforcing Bar From the Republic of Türkiye* ("Rebar from Türkiye"). The U.S. Department of Commerce's ("Commerce") final results were published in the *Federal Register* on April 6, 2026. *See Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the Antidumping Duty Administrative Review; 2023–2024*, 91 Fed.

Reg. 17246 (Dep't Commerce Apr. 6, 2026) ("*Final Results*"), ECF No. 19-5, P.R. 6. The period of review ("POR") is July 1, 2023 through June 30, 2024. For the reasons set forth below, Çolakoğlu respectfully request that the Court reverse the challenged determination of Commerce and remand with instructions for Commerce to reconsider: (1) its decision to limit Çolakoğlu's sales-side duty drawback adjustment to inward processing certificates ("IPCs") that closed during the POR; (2) its decision to exclude closed IPCs from the sales-side duty drawback adjustment while including the same IPCs in the cost-side adjustment; (3) its categorization of two of Çolakoğlu's accounts and the resulting recalculation of Medtrade Inc.'s ("Medtrade") indirect selling expense ("ISE") ratio; (4) its decision to use invoice or shipment date, rather than contract date, as the date of sale for Çolakoğlu's U.S. sales; and (5) its arbitrary calculation of Çolakoğlu's margin, which is unreasonably higher than the margins Commerce calculated in prior segments of this proceeding, without adequate reasoning or evidentiary support.

Commerce's factual and legal conclusions underlying the *Final Results* are set forth in its Issues and Decision Memorandum. Memorandum from E. Eastwood to C. Abbott, re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review Antidumping duty of Steel Concrete Reinforcing Bar from the Republic of Türkiye; 2023-2024 (Mar. 30, 2026) ("*IDM*"), ECF No. 19-4, P.R. 7.

## II. ISSUES PRESENTED

Çolakoğlu raises the following issues of fact and law in this brief:

### A. Whether Commerce Reasonably and Lawfully Limited Çolakoğlu's Duty Drawback Adjustment to Certain IPCs that "Closed" During the POR.

No. Commerce's limitation of Çolakoğlu's sales-side duty drawback adjustment to IPCs closed during the POR (or "POR limitation") is unreasonable and contrary to law. The record demonstrates that the IPC used during the POR closed before Çolakoğlu's initial questionnaire

response, giving Commerce the certainty it requires. Further, the closure date does not change when liability accrued or what information Commerce received such that Commerce cannot lean on claim that the POR limitation improves accuracy and administrability. Commerce also ignored its own contrary practice in Turkish proceedings, without providing an adequate explanation for departing from those decisions. Finally, Commerce ignored precedent rejecting POR/POI limitation.

B. Whether Commerce Reasonably and Lawfully Excluded Closed IPCs from Çolakoğlu's Sales-Side Duty Drawback Adjustment While Including the Same IPCs in the Cost-Side Duty Drawback Adjustment.

No. Commerce acted unreasonably and unlawfully when it treated the same IPCs differently on the two sides of its duty drawback calculation. In *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1342-43 (Fed. Cir. 2011), the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") articulated a matching principle: the sales-side adjustment and the cost-side adjustment must be reciprocal. Despite this unambiguous directive, Commerce counted all the closed IPCs in Çolakoğlu's cost-side adjustment while not making a reciprocal adjustment (*i.e.*, leaving out IPCs) in the sales-side adjustment. Commerce merely asserted that the two adjustments differ, warranting disparate treatment. But this explanation does not give Commerce license to depart from the Federal Circuit's directive. Even worse, Commerce has applied the matching principle in other Turkish decisions and failed to come to grips with those decisions here.

C. Whether Commerce Reasonably and Lawfully Categorized Two of Çolakoğlu's Accounts Resulting in the Subsequent Recalculation of Medtrade's ISE Ratio.

No. Commerce's categorization of two accounts when it recalculated Medtrade's ISE ratio is not supported by the record and not reasonably explained. First, apart from one inadvertent misstatement, the record showed that one account reflected financial expenses, not indirect selling

expenses. Second, Commerce ignored evidence that this account already flows into the INTEX calculation through Medtrade's financial statement, so also counting it in the ISE ratio double-counts it. Third, Commerce removed revenue from the other account in the ISE calculation, ignoring that Commerce had accepted and verified Çolakoğlu's reporting of this account prior reviews. Commerce's explanation for that change was only a bald assertion and cannot support treating similar situations differently.

D. Whether Commerce Reasonably and Lawfully Refused to Rely on the Date of Sale as Reported by Çolakoğlu Based on Contract Date and Used Shipment or Invoice Date for Çolakoğlu's U.S. Sales.

No. Commerce unreasonably rejected Çolakoğlu's contract-date reporting and used the invoice date instead to determine the date of sale for Çolakoğlu's U.S. sales. Commerce may depart from the invoice-date presumption when satisfactory evidence shows the material terms were firmly established on another date. Çolakoğlu consistently showed that price, quantity, and delivery terms did not change between contract and invoice beyond the agreed tolerances. It also showed that all negotiations ended before the contract was finalized. Commerce found that terms changed but cited no example and gave only conclusory explanations. Commerce did not consider the record as a whole, and its decision must be reconsidered.

E. Whether Commerce Complied with Its Statutory Mandate to Calculate an Accurate Dumping Margin for Çolakoğlu.

No. Commerce acted unreasonably with respect to its decisions pertaining to its calculation of Medtrade's ISE ratio, the date of sale determination, and particularly with respect to its duty drawback calculation. As described in Sections IV.A and B below, Commerce's reliance on a new methodology to calculate duty drawback is inconsistent with its practice, the law, 19 U.S.C. § 1677a(c), which requires an adjustment for duty drawback, and tenets of administrative law requiring consistency. The result of Commerce's new duty drawback methodology is a decidedly

inaccurate dumping margin for Çolakoğlu. Çolakoğlu has participated in five rebar antidumping duty reviews, always earning a calculated dumping margin of less than two percent. Çolakoğlu has not changed its production, pricing, or shipments, including its use of duty drawback, so significantly in the 2023-2024 period of review to warrant a significant increase in the dumping margin.

## III. STATEMENT OF FACTS

On July 1, 2024, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on rebar from Türkiye for the POR. *See Antidumping or Countervailing Duty Order, Finding or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 89 Fed. Reg. 54437 (Dep't Commerce July 1, 2024).

On July 29, 2024, Çolakoğlu requested an administrative review of its sales and shipments of subject merchandise during the POR. *See* Çolakoğlu's Request for Antidumping Administrative Review (July 29, 2024), P.R. 136. Commerce initiated the review on August 14, 2024. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 66035 (Dep't Commerce Aug. 14, 2024), P.R. 133. Commerce selected Çolakoğlu as the sole mandatory respondent. Memorandum from Z. Brittain to E. Eastwood, re: 2023-2024 Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Türkiye: Respondent Selection (Sept. 9, 2024), C.R. 172, P.R. 114. Çolakoğlu actively participated in the administrative review and submitted timely and complete responses to Commerce's questionnaires and supplemental questionnaires. *See, e.g.*, Çolakoğlu's Section A Questionnaire Response (Oct. 7, 2024), C.R. 155–170, P.R. 91–98 ("Sec. A QR"); Çolakoğlu's Section B Questionnaire Response (Nov. 1, 2024), C.R. 141–154, P.R. 82; Çolakoğlu's Section C Questionnaire Response (Nov. 4, 2024), C.R. 119–140, P.R. 80–81 ("Sec. C QR"); Çolakoğlu's Section D Questionnaire

Response (Nov. 7, 2024), C.R. 102–118, P.R. 77 ("Sec. D QR"); Çolakoğlu's Response to Sections A-C of the Supplemental Questionnaire (Apr. 17, 2025), C.R. 48–85, P.R. 49 ("Supp. A-C QR"); Çolakoğlu's Supplemental Section D Questionnaire Response (Apr. 24, 2025), C.R. 24–47, P.R. 48; Çolakoğlu's Second Supplemental Section D Questionnaire Response (Third Supplemental Questionnaire Response) (June 10, 2025), C.R. 19–21, P.R. 42.

In its Section C questionnaire response, Çolakoğlu reported the IPC used during the POR and provided supporting documentation of its closure, including screenshots of the realized consumption and yield/loss ratios. Sec. C QR at C-41 to C-42, Exhs. C-19, C-21, C.R. 140, 133–135, P.R. 81-80. In its supplemental questionnaire response, Çolakoğlu provided additional documentation, including a full listing of IPCs appearing in the Government of Türkiye's ("GOT") IPC portal and the status of each IPC as open, closed,[1] or under closure, together with screenshots from the portal supporting the quantity and value of imports and exports for the selected IPCs—documents similar to those verified in prior administrative reviews. Supp. A-C QR at Exhs. S1-41 to S1-44, C.R. 69–72, P.R. 49. Çolakoğlu submitted evidence demonstrating that the expenses recorded in Medtrade's[2] account [ ] should be excluded in calculating Medtrade's ISE ratio. *See* Sec. C QR, Exh. C-22, C.R. 133, P.R. 80; Sec. A QR, Exh. A-16, C.R. 165–166, P.R. 98. Additionally, Çolakoğlu established that the revenue from account [ ] should be included in the ISE ratio. *See* Suppl. Secs. A–C QR, Exh. S1-47, C.R. 70, P.R. 49. Çolakoğlu also reported the contract date as the date of sale for its U.S. sales and

---

[1] A "closed" IPC means that the exporting company is "officially released from duty liability by the Turkish Government." *Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States Aluminum Ass'n Trade Enf't Working Grp.*, No. 21-00616, 2024 WL 2044061, at *2 (Ct. Int'l Trade May 8, 2024).

[2] Medtrade is Çolakoğlu's U.S. affiliate that sells to unaffiliated third-parties in the United States.

provided documentation demonstrating that there were no changes to the material terms of sale—including volume, price, delivery date, and latest date of shipment—between the contract and invoice outside of the agreed-upon tolerances, including a comparison of invoices to contracts covering thousands of sales lines. Sec. C QR at C-19, Exh. C-6, C.R. 140, P.R. 81; Supp. A-C QR at S1-21, Exh. S1-24, C.R. 85, 75–76, P.R. 49.

Commerce issued its preliminary results on August 6, 2025, which were published in the *Federal Register* on August 12, 2025, and assigned Çolakoğlu an individual rate of 18.87 percent. *Steel Concrete Reinforcing Bar from the Republic of Türkiye: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023–2024*, 90 Fed. Reg. 38743 (Dep't Commerce Aug. 12, 2025), P.R. 33 ("*Preliminary Results*"), and accompanying Preliminary Decision Memorandum, P.R. 34 ("*PDM*"). Commerce primarily used shipment or invoice date, rather than contract date, as the date of sale for Çolakoğlu's U.S. sales. *PDM* at 8-9. Commerce also denied Çolakoğlu's sales-side duty drawback adjustment while including the IPC in the cost-side adjustment. *See IDM* at 13–14, ECF No. 19-4, P.R. 7. Commerce then recategorized the expenses associated with the [ ] account and the revenue associated with the [ ] account without explaining its change in treatment from past reviews. *See* Memorandum from S. Evans to The File, re: Preliminary Results Analysis Memorandum for Colakoglu Metalurji A.S./Colakoglu Dis Ticaret A.S. at 3 (Aug. 6, 2025), C.R. 16, P.R. 32 ("Prelim. Analysis Memo"). In the five rebar antidumping duty reviews in which Çolakoğlu has participated, it has always received a calculated dumping margin of less than two percent.

Çolakoğlu submitted its case brief to Commerce on September 2, 2025. *See* Çolakoğlu's Case Brief (Sept. 2, 2025), C.R. 5, P.R. 27 ("Çolakoğlu's Case Br."). Çolakoğlu argued that Commerce erroneously excluded the reported IPC from its sales-side duty drawback adjustment

despite record evidence demonstrating that the IPC had closed, and that this exclusion departed from Commerce's prior decisions, its practice, and the duty drawback analysis approved by the courts. *Id.* at 3, 7-16. Çolakoğlu argued in the alternative that, if Commerce continued to accept only IPCs closed during the POR, it should still include the prior IPCs that closed during the POR. *Id.* Çolakoğlu also argued that Commerce applied the incorrect date of sale and improperly recategorized two of its accounts in recalculating Medtrade's ISE ratio. *Id.* at 4, 28-31.

On September 11, 2025, Çolakoğlu submitted a rebuttal brief. *See* Çolakoğlu's Rebuttal Case Brief (Sept. 11, 2025), C.R. 4, P.R. 23. Çolakoğlu disagreed with the Rebar Trade Action Coalition's argument that any sales-side duty drawback adjustment should be "inflated back and applied to the entry date" rather than the sales date, and reiterated that Commerce erroneously excluded the reported IPC despite record evidence demonstrating that it had closed. *Id.* (quoting RTAC's Case Brief at 2 (Sept. 2, 2025), C.R. 7, P.R. 28).

On March 30, 2026, Commerce issued its final results, *see IDM*, ECF No. 19-4, P.R. 7, which were published in the *Federal Register* on April 6, 2026, *see Final Results*, ECF No. 19-5, P.R. 6. Commerce's conclusions and calculations regarding the date of sale, the duty drawback issues, and the recategorization of Çolakoğlu's accounts were unchanged from the *Preliminary Results*. *See IDM* at 7–23.

Çolakoğlu timely commenced this action by filing a summons on May 6, 2026, ECF No. 1, and filed its complaint on June 5, 2026, ECF No. 8. The *Final Results* are unsupported by substantial evidence on the record and are otherwise not in accordance with law with respect to the matters set forth below.

## IV. STANDARD OF REVIEW

Upon review, this Court "shall hold unlawful any determination, finding, or conclusion" that is found "to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). To determine whether Commerce's actions are supported by substantial evidence, the Court assesses whether Commerce's actions were *reasonable* in light of the record as a whole; *i.e.*, whether Commerce based its decisions on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotations omitted)); *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Where an agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency," it cannot be found to be reasonable. *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To act in accordance with law, Commerce "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Commerce has a duty to both exercise its discretion in a manner that is reasonable and to avoid arbitrary action. If Commerce abuses its discretion or its decision is arbitrary or capricious, then its determination is not in accordance with law. *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will {also} be set aside if it is arbitrary and capricious." (alteration in original) (quoting *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012)); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995) (remanding where Commerce's refusal to accept corrective information constituted an abuse of discretion). Additionally, this Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly,

relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F.Supp.451, 454 (Ct. Int'l Trade 1996).

## V. SUMMARY OF ARGUMENT

As discussed in Section II, there are five primary issues in this case. First, Çolakoğlu used an IPC during the POR, the GOT closed that IPC, and Çolakoğlu placed evidence of the closure on the record in its initial questionnaire response. Commerce does not dispute any of this. Yet Commerce denied the sales-side duty drawback adjustment because the IPC closed after the POR. But the evidence of closure gave Commerce the certainty it claims to require, and the closure date did not change when the liability accrued or what information Commerce received. Exacerbating its error, Commerce ignored its own practice in other Turkish proceedings of granting the adjustment for closed IPCs regardless of when they closed, and it failed to come to grips with this Court's precedent rejecting the same limitation. Commerce's attempt to distinguish that precedent as turning on verification also fails, because Commerce cannot rely on its own decision not to verify evidence it does not dispute.

Second, Commerce's inconsistent treatment of the same IPCs is contrary to law. Under the matching principle upheld in *Saha Thai*, the sales-side and cost-side duty drawback adjustments must be reciprocal. Commerce nevertheless included the closed IPC in the cost-side adjustment while excluding it from the sales-side adjustment. Commerce's only explanation—that the two adjustments are "different in nature"—does not address reciprocity, which Commerce itself recognized in a prior review of rebar from Turkey.

Third, Commerce's categorization of two accounts in recalculating Medtrade's ISE ratio is unsupported. The record shows that one account reflected financial expenses already captured in the INTEX calculation through Medtrade's financial statement, so including it in the ISE ratio (as Commerce did) double-counts the expense. Commerce dismissed this evidence as "unclear"

without explanation. Commerce also removed revenue from the ISE calculation that it had accepted and verified in prior reviews, offering only the bald assertion that it must rely on the record of each case. Commerce's ISE calculation should be remanded for a reasoned explanation.

Fourth, Commerce's refusal to use the contract date as the date of sale is unreasonable. Although the invoice date is presumptively the date of sale, that presumption is overcome where the record as a whole shows that the material terms of sale were firmly and finally established on another date. Çolakoğlu demonstrated that price, quantity, and delivery terms did not change between contract and invoice beyond the agreed-upon tolerances, and that all negotiations concluded before the contract was finalized. Commerce concluded otherwise without identifying a single changed term. Commerce's date-of-sale determination should be remanded.

Fifth, Commerce abused its discretion in calculating a margin for Çolakoğlu that is vastly different from the margins it calculated for Çolakoğlu in preceding reviews, without identifying any change to Çolakoğlu's production process, sales, or any other factor impacting the margin calculation. Commerce arbitrarily reversed its position with respect to factors impacting Çolakoğlu's margin, without providing reasonable justifications. Commerce did not and cannot provide an explanation for the disparate calculation of Çolakoğlu's margin in this review, and its calculation should be remanded.

## VI. ARGUMENT

### A. Commerce Unreasonably and Unlawfully Limited Çolakoğlu's Sales-Side Duty Drawback Adjustment to Certain IPCs That "Closed" During the POR

A sales-side duty drawback adjustment applies to the export price ("EP") or constructed export price ("CEP") of subject merchandise where "a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States." *Saha Thai*, 635 F.3d at

1338 ; *see also* 19 U.S.C. § 1677a(c)(1)(B). The Federal Circuit upheld a two-prong test to assess duty drawback eligibility, where the respondent must demonstrate:

> (1) that the {relevant} rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

*Saha Thai*, 635 F.3d at 1340 (citation omitted). In *Uttam Galva Steels Ltd. v. United States*, the Federal Circuit made clear that the statute "requires an adjustment to 'export price' *based on the full extent of the duty drawback*." 997 F.3d 1192, 1197 (Fed. Cir. 2021) (emphasis added). Commerce itself has recognized that "{t}o not apply a duty drawback adjustment would be 'unreasonably undercut{ting} its stated goals of accuracy, transparency, and predictability by ignoring verified record information.' Therefore, Commerce must apply a duty drawback adjustment . . . regardless of when the IPC closed." *Aluminum Extrusions From the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 80512 (Dep't Commerce Oct. 3, 2024), and accompanying Issues and Decision Memorandum at 11 ("*Alum. Extrusions Final Inv. IDM*").

Türkiye maintains a duty drawback system known as an Inward Processing Regime ("IPR"), where "exporters of merchandise from Turkey may have their duty liability on imports forgiven if the exporter satisfies certain requirements." *Assan Aluminiyum Sanayi ve Ticaret A.S. v. United States*, No. 21-00246, 2026 WL 1747091, at *2 (Ct. Int'l Trade June 17, 2026) (citing *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 654 F.Supp.3d 1311, 1318 (Ct. Int'l Trade 2023)). Under this system, "{i}nterested firms in Turkey secure {IPCs}, which 'set forth the quantity of raw material allowed to be imported duty-free and the quantity of export required to close the IPC." *Id.* The liability for the duties is then "extinguished" when the GOT officially "close{s}" the IPC, "meaning that an exporter has demonstrated sufficient amounts of

corresponding imports and exports to Turkish authorities." *Id.* Commerce will grant duty drawback adjustments where the respondent shows "that raw material imported under an IPC is sufficiently related to a duty drawback on the exported subject merchandise." *Id.* at *8.

Çolakoğlu reported to Commerce that an IPC was used during the POR [ ]—[ ]. Specifically, in its initial Section C questionnaire response to Commerce, Çolakoğlu reported the IPC used during the POR and submitted documentation of its closure. Sec. C QR at C-41 to C-42 and Exhs. C-19 and C-21, C.R. 140, 135-133, P.R. 81, 80; Supp. A-C QR at Exhs. S1-41 to S1-44, C.R. 72-69, P.R. 49. Çolakoğlu further provided Commerce with additional supporting documentation, including a full listing of IPCs and the status of each IPC as either open, closed, or under closure, as well as screenshots from the GOT's IPC portal supporting the quantity and value of both imports and exports for the selected IPCs—documents that were accepted and verified in previous proceedings. *Id.* This evidence demonstrated, and Commerce does not contest, that the IPC was closed. Because Çolakoğlu submitted evidence of IPC closure in its initial questionnaire response and again in its supplemental response, Commerce had the entirety of the administrative review process to analyze the provided data and ask supplemental questions related to the verification of the closed IPC.

Commerce subsequently examined the provided evidence and documentation related to the closed IPC and the reporting necessary for the duty drawback request, including the realized consumption, and did not alert Çolakoğlu to any discrepancies or issues with the IPC reporting. Nor did Commerce issue subsequent supplemental questionnaires to inquire further about the IPC or issue a request for verification of Çolakoğlu's reporting. Despite the clear evidence Çolakoğlu provided, it was only after all reporting and responses were complete that Commerce announced

in its Preliminary Determination, and subsequent final results, that it limited the duty drawback adjustment to IPCs that were both used and closed by the GOT during the POR.

Commerce's decision to limit the duty drawback adjustment to IPCs that were closed by the GOT during the POR must be remanded for further consideration as one that is unreasonable and "runs counter to the evidence before the agency"—evidence on the record, accepted by Commerce, that the IPC closed. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Importantly, an agency "must examine the relevant data on the record, and articulate a satisfactory explanation for its action, including addressing material evidence on the record which detracts from its conclusion." *Am. Kitchen Cabinet All. v. United States*, 745 F.Supp.3d 1270, 1279 (Ct. Int'l Trade 2024) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *see also Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (internal citation omitted) ("The court reviews the record as a whole, including evidence that fairly supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"). If an agency "offered an explanation for its decision that runs counter to the evidence before the agency," its determination cannot be found to be reasonable. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. At the outset, Plaintiffs acknowledge that it is not the court's role to "pick and choose among the record evidence preferred by one party." *Am. Kitchen Cabinet All. v. United States*, 803 F.Supp.3d 1231, 1243 (Ct. Int'l Trade 2025), *appeal docketed*, No. 26-1977 (Fed. Cir. June 26, 2026). Plaintiffs do not ask the court to "substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, but instead ask that this Court remand Commerce's *Final Results* for the agency to make its decision based on the record as a whole.

1. *<u>The Record Evidence Supports a Duty Drawback for All Closed IPCs Reported During the Review</u>*

Here, Commerce's decision to deny Çolakoğlu's duty drawback adjustment for IPC [ ] is unreasonable, as it is unsupported and contrary to the record evidence. Commerce asserted in its *Final Results* that "under the Turkish duty drawback system, Turkish companies are liable for the amount of duties forgone until satisfying the export requirements under an IPC, and there is no certainty that this has occurred until the IPC is closed." *IDM* at 9, ECF No. 19-4, P.R. 7. This explanation, however, runs counter to the evidence because the record clearly provided Commerce with this exact certainty. Importantly, nowhere in the *Final Results* does Commerce question the validity of the closure or dispute that the IPC used during the POR closed; rather, Commerce illogically asserts that this closure is somehow insufficient because it occurred after the POR, but before reporting.

Commerce attempts to explain that evidence of closure during the POR is somehow tied to certainty by asserting that the GOT's duty drawback program "stipulates that Turkish companies are liable to pay any export duties foregone." *IDM* at 10, ECF No. 19-4, P.R. 7. This explanation erroneously conflates the date on which liability is finalized (i.e., no longer subject to change) with the actual accrual of liability itself. That a firm's liability is finalized after the POR, does not mean that the firm did not incur that liability during the POR. Indeed, Commerce does not (and could not) claim that it lacks the necessary information to calculate the duty drawback adjustment (on the sales-side or the cost-side) simply because the date of closure post-dates the POR—rather, Commerce claims that it can only apply the adjustment if the IPC closed during the POR. This is nonsensical. While most administrative reviews cover a one-year POR, it takes an average of three-to-four *years* from the closing date of an export declaration from Turkish Customs to receive a final GOT official approval. *Tosçelik Profil ve Sac Endüstrisi A.Ş. v. United States*

(“*Tosçelik AR1 Appeal*”), 321 F.Supp.3d 1270, 1276 (Ct. Int’l Trade 2018). Therefore, Commerce’s refusal to calculate the duty drawback adjustment is unreasonable. That is, there is no reasonable basis for Commerce to apply the duty drawback adjustment for IPC [ ] had the GOT officially closed it on June 30, 2024 (the final day of the POR), but deny the adjustment because the GOT closed it [ ] later [ ]. *See* Sec. C QR, Exhs. C-19 and C-21, C.R. 133-135, P.R. 80. The official closure date has no effect on the date the IPC was used. The IPC was closed and Commerce has the certainty it requires to calculate and apply the duty drawback adjustment. Nothing more is required. *See Icdas*, 654 F.Supp.3d at 1318–21 (observing that Commerce has a practice of requiring “some evidence of finality for the drawback adjustment”). The question is whether the IPC was used during the POR—it was—and whether there is sufficient evidence on the record that it was closed by the government, so as to eliminate any uncertainty as to liable duties—there is. Commerce’s claim that the record lacked the requisite IPC closure fails to come to grips with record contains evidence that the IPC closed.

Rather than address the record evidence, Commerce relied on the conclusory policy explanation that “{r}eliance only on IPCs closed during the review period being examined promotes the accuracy and administrability of dumping proceedings from segment to segment.” *IDM* at 12, ECF No. 19-4, P.R. 7. Commerce claimed that this policy “permits Commerce to evaluate the sufficiency and accuracy of the data early in a segment of a proceeding” and “provides predictability and transparency in Commerce’s evaluation of duty drawback claims” and “deadlines for interested parties to provide new factual information and responses.” *Id.* Commerce asserted this without any specific application to the record evidence before it that the IPC was <u>closed</u>, *i.e.*, not open, thereby eliminating any risk of uncertainty.

Importantly, the date of closure does not impact the date on which Commerce received the information of closure. The IPC closed before Çolakoğlu filed its initiation response to Commerce's Section C Questionnaire, and Çolakoğlu's reporting of the closure remained consistent throughout the administrative review. *See* Sec. C QR at C-41 to C-42, C.R. 140, P.R. 81. In other words, Commerce would have received the exact same information in Çolakoğlu's Section C Questionnaire Response if the IPC had closed during the POR. Thus, Commerce does not (and cannot) explain why an earlier closure date would have permitted it "to evaluate the sufficiency and accuracy" of the IPC data. *IDM* at 12, ECF No. 19-4, P.R. 7. Çolakoğlu provided complete and useable data as early as it possibly could have. Commerce also does not explain how its POR limitation would support predictability. Again, the information that Çolakoğlu reported would have been the same if the IPC closed during the POR. When Commerce received evidence that the IPC closed, there was no risk of uncertainty. The issue relating to Commerce's uncertainty concern is whether the agency was able to determine that the IPC *did actually close*, thus extinguishing the duty liability that the agency cites. That the IPC closed outside of the POR is not relevant to the amount of benefit received by Çolakoğlu because Commerce knew that the IPC did close. This is the same reasoning that was rejected in *Tosçelik Profil ve Sac Endüstrisi A.Ş. v. United States* ("*Tosçelik Investigation Appeal II*"), 348 F.Supp.3d 1321, 1327 (Ct. Int'l Trade 2018). The Court should reject Commerce's reasoning here.

2. *Commerce's Decision to Exclude Certain IPCs Unreasonably Ignores Agency Practice and Court Precedent Raised by Plaintiffs*

Further, Commerce's decision to exclude the closed IPC on the record is inconsistent with the statute, binding case law, and Commerce's practice of calculating duty drawback adjustments in Turkish cases.

It is a firmly established principle of administrative law that an agency must "come to grips with conflicting precedent" to avoid "an inexcusable departure from the essential requirement of reasoned decision making." *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (quoting *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)); *Katunich v. Donovan*, 599 F.Supp. 985, 986 (Ct. Int'l Trade 1984) ("It is a sound principle of administrative law that an administrative agency must either follow or adhere to existing policies and precedents or explain its non-compliance or deviation."). Commerce must explain its "reasons for treating similar situations differently" or its decision is arbitrary and must be remanded. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)); *Calgon Carbon Corp. v. United States*, 487 F.Supp.3d 1359, 1365 (Ct. Int'l Trade 2020). Here, Commerce claimed that its POR limitation "is consistent with Commerce's general practice of collecting allocated expense data covering the POR for sales and adjustment purposes." *IDM* at 12. But Commerce's assertion of a *general* practice related to expense data is not *specific* to IPCs or duty drawback. Invoking this general and overly broad practice and fails to address (let alone explain) conflicting decisions raised by Plaintiffs, both at the agency level and before reviewing courts. Moreover, Commerce's reliance on *Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42216 (Dep't Commerce Aug. 29, 2025) ("*CORE from Türkiye*"), and accompanying Issues and Decision Memorandum at 38-46 (Cmt. 17), is disingenuous at best. *See IDM* at 13 & n.55. First, *one* agency determination does not equate to general practice. Second, and more importantly, that case is similarly on appeal at this Court for this exact issue. Commerce's citation to *CORE from Türkiye* only makes clear that there is no general practice of limiting IPCs to those that closed during the POR.

By contrast, in Çolakoğlu's brief in response to the *Preliminary Results*, it highlighted to the agency multiple examples where Commerce consistently incorporated IPCs *used* (not necessarily closed) during the POR to highlight that Commerce has a practice of calculating the sales-side duty drawback adjustment using such IPCs, and that Commerce departed "changed its methodology with little to no explanation." Çolakoğlu's Case Br. at 8 & n.33, and 10 & n.46, C.R. 5, P.R. 27 (citing *Common Alloy Aluminum Sheet From the Republic of Türkiye: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 89965 (Dep't Commerce Nov. 14, 2024) ("*CAAS from Türkiye AR22–23 Final Results*"), and accompanying Issues and Decision Memorandum at 5–7 ("*CAAS AR22–23 IDM*"); *Certain Aluminum Foil From the Republic of Türkiye: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 21896 (Dep't Commerce May 22, 2025) ("*Foil from Türkiye AR22–23 Final Results*"), and accompanying Issues and Decision Memorandum at 11 ("*Foil 22-23AR IDM*"); *Steel Concrete Reinforcing Bar From the Republic of Türkiye: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 66350 (Dep't Commerce Aug. 15, 2024) ("*Rebar from Türkiye AR22–23 Prelim. Results*"), and accompanying Preliminary Decision Memorandum at 11-12 ("*Rebar 22-23AR PDM*") (unchanged in final results); *Alum. Extrusions Final Inv. IDM* at 11.

Specifically, in *CAAS from Türkiye AR22–23 Final Results*, Commerce calculated the sales-side duty drawback adjustment using a closed IPC, regardless of when the IPC closed. *See CAAS AR22–23 IDM* at 5–7. In fact, Commerce noted that it was implementing this approach to be consistent across all proceedings involving Türkiye and IPCs. *See CAAS AR22–23 IDM* at 5–6 (explain that "Commerce is revising its methodology to be consistent with *Aluminum Foil from Türkiye*"). Similarly, in *Foil from Türkiye AR22–23 Final Results*, Commerce limited the sales-

side duty drawback adjustment to "the closed IPC"—not the IPC closed during the POR. *See Foil 22-23AR IDM* at 10–11. In the *Rebar from Türkiye AR22–23 Preliminary Results*, Commerce articulated that it has a "practice" of adjusting "U.S. price for duty drawback {based} on closed IPCs as these claims have been finalized and are no longer subject to change by the exporter." *Rebar 22-23AR PDM* at 12. Finally, in the *Aluminum Extrusions Final Determination*, Commerce agreed that the sales-side duty drawback adjustment should be "made pursuant to a closed IPC, whether the IPC was closed prior, during, or after the POI" because the adjustment "should be made to sales pursuant to all IPCs which {the respondent} has demonstrated on the record have been closed." *Alum. Extrusions Final Inv. IDM* at 11. Commerce found that refusing to apply the duty drawback adjustment under these circumstances would undercut "its stated goals of accuracy, transparency, and predictability by ignoring verified record information." *Id.* (citation omitted).

The throughline in these decisions is that Commerce has a stated and observed practice of applying the sales-side duty drawback adjustment when the record contains evidence that the IPC closed. There is no additional requirement that the IPC be closed during the POR.

Rather than engage with the Çolakoğlu's arguments and supporting administrative case law, Commerce ignored the cited decisions and asserted a general conclusion that it "has previously excluded import duties related to imports from a prior period from the calculation of COP" of the period under review. *IDM* at 11 & n.50, ECF No. 19-4, P.R. 7 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Carbon and Certain Alloy Steel Wire Rod from Mexico*, 67 Fed. Reg. 55800 (Dep't Commerce Aug. 30, 2002) ("*Wire Rod from Mexico*"), and accompanying Issues and Decision Memorandum at 25–27 (Cmt. 10) ("*Wire Rod from Mexico IDM*")). But in *Wire Rod from Mexico*, Commerce declined to include import duties in the G&A ratio calculation because "the duties paid bear{ed} no relationship to the cost of producing subject

merchandise during the POI." *Wire Rod from Mexico IDM* at 26. Thus, *Wire Rod from Mexico* does not support a bright-line rule that Commerce should exclude cost data (*i.e.*, import duties) in calculating normal value just because some of the relevant information is outside of the POR. Rather, the decision demonstrates that Commerce should reject cost data when the data have no connection to producing the subject merchandise. Clearly, the IPC data (in this case) have a strong relationship to the cost of producing rebar. *Wire Rod from Mexico* does not support Commerce's POR limitation.

Similarly, Commerce failed to consider precedent before this Court and the Federal Circuit that specifically addresses this issue and that detracts from its assertion that limiting IPCs to those closed during the POR is consistent with the agency's "general practice in other areas of the dumping calculation." *IDM* at 11, ECF No. 19-4, P.R. 7. In its case brief in response to the *Preliminary Results*, Çolakoğlu argued that the agency's position that evidence of finality must arise during the POR has been explicitly and repeatedly rejected. Çolakoğlu's Case Br. at 11, C.R. 4, P.R. 23 (citing *Uttam Galva Steels Ltd.*, 997 F.3d at 1197; *Icdas*, 654 F.Supp.3d at 1311; *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F.Supp.3d 1343, 1357 (Ct. Int'l Trade 2023); *Tosçelik Investigation Appeal II*, 348 F.Supp.3d at 1328; *Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.Ş. v. United States*, 439 F.Supp.3d 1342, 1347 (Ct. Int'l Trade 2020); *Tosçelik AR1 Appeal*, 321 F.Supp.3d at 1276). In fact, "{t}he court has long relied on the duty drawback adjustment's two-prong test, and has rejected attempts to 'add a new hurdle to the drawback test that is not required by the statute'" because "Commerce's evaluation of when an IPC is closed has *evolved*." *Icdas*, 654 F.Supp.3d at 1320 (citation omitted) (emphasis added).

Commerce's explanation regarding general practice is therefore not in accordance with the law. The Court has struck down the argument Commerce deployed here in another case. In the

*Tosçelik Investigation Appeal II*, the Court previously looked at submitted IPCs that were closed by the GOT after the POI, were still reported to and verified by Commerce, but were nonetheless excluded from the duty drawback adjustment. 348 F.Supp.3d 1321. After voluntary remands, the agency abandoned its earlier arguments, which "merely concluded that the POI limitation {Commerce} applied," and its contention that a POI limitation would "thwart potential manipulation of 'information reflected on the {IPCs} prior to their closure.'" *Id.* at 1325 (citation omitted). Commerce instead argued before the Court that its POI limitation, even when the information was verified by Commerce, would "reasonably allow{} Commerce to evaluate respondents' 'actual duty liability extinguished . . . during the POI.'" *Id.* (citation omitted). The Court found that, despite "Commerce and the interested parties {doing} an excellent job in the investigation and remand proceeding working through the complexities of the Turkish IPR," ultimately "Commerce failed to identify a reasonable explanation supported by the record." *Id*. at 1326. In other words, Commerce's POI limitation was not reasonable. It further found that under the Turkish drawback program, "Commerce's treatment of costs and expenses tends to depend on the <u>nature</u> of the expense, rather than a consistent, imagined adherence to calculating all costs solely that occur and are accounted for in the POI." *Id*. at 1327 (emphasis in original). The Court went on to reject Commerce's rationale that the POI limitation for the closure of IPCs is "more administrable for Commerce," holding instead that any "interesting hypothetical of impractability" fails where "Commerce verified the usage and closure of the {IPCs} on the record, including those that closed after the POI, and all of which included exports to the United States made during the POI." *Id.* at 1325, 1327. Simply put, "Commerce's verification of all the closed {IPCs} belies its arguments that it would be impracticable to do so. Commerce did it." *Id.* at 1327.

Following the *Tosçelik Investigation Appeal II*, the Court has continued to reject attempts by Commerce to limit IPC closures to those in the POR, and has acknowledged that there is no consistent agency practice to do so. For example, in *Habaş*, the closure of IPC 1598 was brought to Commerce's attention only during verification—evidence of its closure was not on the record before verification. 439 F.Supp.3d at 1348–49). Relying on the *Tosçelik Investigation Appeal II*, the Court repeated that it had "rejected Commerce's POI limitation as 'unreasonably undercut{ting} {Commerce's} stated goals of accuracy, transparency and predictability by *ignoring verified record information*.'" *Id*. (first alteration and emphasis in original) (quoting *Tosçelik Investigation Appeal II*, 348 F.Supp.3d at 1328). And while the court in *Habaş* sustained Commerce's exclusion of IPC 1598 from the duty drawback adjustment, it only did so because there was no evidence of closure before verification. This case does not support a blanket POR limitation (as Commerce did in this case), but only supports excluding evidence of an IPC when that evidence is first introduced during verification—which is not an issue in this appeal.

Next, in *Icdas*, the Court found that "Commerce has not always been clear as to when it will consider an IPC closed," but that in accepting IPC closures that occurred post-POI, it is not unreasonable for Commerce to require "some evidence of finality for the drawback adjustment." 654 F.Supp.3d at 1321. Most recently in *Assan*, the Court held that "closure of an IPC is a necessary condition to establish eligibility for a duty drawback adjustment," but that such eligibility also "depends on a showing that the exemption from the import duties is linked, or related, to the exportation of subject merchandise, and that the quantity of imports is sufficient to account for the exemption." 2026 WL 1747091, at *10. Notably, while the *Assan* Court did not grant a duty drawback adjustment for an IPC that closed after the POI, the reasoning was not Commerce's assertion here: that IPCs will only be considered by the agency where they closed

within the POI. Rather, the Court acknowledged that an IPC that closed after the POI must also be supported by evidence regarding the amount and nature of such an adjustment. *Id.* at *11. Çolakoğlu has provided such evidence in this review.

Rather than acknowledge the Court's holdings rejecting the "general practice" of rejecting IPCs that were closed after the POR, Commerce attempted, and failed, to distinguish these cases by arguing that these cases relied on verification. This argument is disingenuous at best. As an initial matter, this argument rests on the incorrect assumption that these holdings relied solely on Commerce's verification—a process that is within Commerce's discretion—and not on the remainder of the Court's holdings. Moreover, it is unreasonable for Commerce to choose not to verify Çolakoğlu's submissions, accept that the IPC used during the POR was closed and no longer subject to liability, and then reject the IPC solely because Commerce opted not to verify evidence that it did not dispute. Commerce cannot make decisions "by invoking procedural difficulties that were at least in part a creature of its own making." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Çolakoğlu has been a respondent in multiple reviews by the agency in this case, has actively and fully responded to the best of its ability, and has taken part in multiple previous verifications.

To be sure, Çolakoğlu understands that an agency may reach a different conclusion based on the individual facts of each case and review. However, that is not what occurred in this determination. Here, Commerce failed to consider the previous agency practice raised by Çolakoğlu, to act consistently with that practice, or to explain why this situation is different. Nor did the agency acknowledge this Court's and the Federal Circuit's precedent that directly contradicts its conclusory statements. Just as this Court held that "Commerce is obligated to treat similar situations in a consistent manner and must reasonably explain any deviation from an

established practice," *PT. Zinus Glob. Indon. v. United States*, 762 F.Supp.3d 1257, 1272 (Ct. Int'l Trade 2025), *appeal docketed*, No. 25-1674 (Fed. Cir. Apr. 22, 2025) (citing *SKF USA Inc.*, 263 F.3d at 1382), it should similarly find here that remand is necessary for Commerce to consider the detracting evidence and prior determinations raised, and unaddressed, in the record.

B. Commerce Unreasonably and Unlawfully Excluded Reported IPCs from Çolakoğlu's Sales-Side Duty Drawback Adjustment but Calculated the Cost-Side Duty Drawback Adjustment Based on All IPCs Çolakoğlu Used During the POR

Notwithstanding that Commerce unreasonably limited Çolakoğlu's duty drawback adjustment to a single IPC, Commerce's calculation of the drawback is also not based on substantial evidence or in accordance with law because the agency erred in treating IPCs differently when calculating the cost- and sales-side duty drawback adjustments.

When Commerce makes a duty drawback adjustment to U.S. price—the sales-side adjustment—it:

> makes a corresponding upward adjustment to the cost of production ("COP") and constructed value ("CV") (referred to as the cost-side adjustment) to account for the cost of the unpaid import duties for which the producer remains liable until the merchandise containing the dutiable input(s) is exported and the exemption program requirements are satisfied

*Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*, 357 F.Supp.3d 1325, 1330 (Ct. Int'l Trade 2018) (citing *Saha Thai*, 635 F.3d at 1341–44). The "matching principle," upheld by the Federal Circuit in *Saha Thai*, is "the basic accounting practice whereby expenses are matched with benefits derived from them," *Saha Thai*, 635 F.3d at 1342, *i.e.*, parallel adjustments on both sides of its calculation: the cost- and sales-side duty drawback adjustments. The Federal Circuit held that "EP, COP, and CV should be increased together or not at all." *Id.* at 1343.

In the *Preliminary Results*, Commerce unfairly included all closed IPCs in calculating the cost-side duty drawback adjustment but declined to rely on any of the closed IPCs in calculating the sales-side duty drawback adjustment. *Compare* Prelim. Analysis Memo, Attach. II, Pt 1, C.R.

15, P.R. 32 (including all closed IPCs in the cost-side duty drawback adjustment), *with PDM* at 12, P.R. 34 (declining to calculate any sales-side duty drawback adjustment). Specifically, Commerce included [ ] in the cost-side calculation, but (as explained above) did not calculate a sales-side adjustment using this IPC. Prelim. Analysis Memo, Attach. II, Pt. 1. Commerce's flawed practice remained unchanged in the *Final Results.* There, Commerce summarily found that "{t}he sales-side and cost-side adjustment are different in nature and are appropriately calculated using different information." *IDM* at 13, ECF No. 19-4, P.R. 7. However, Commerce's explanation does not address the principle that for the calculation of the antidumping duty rate to be accurate, the sales and costs adjustments must be reciprocal. *See Saha Thai*, 635 F.3d at 1342-43; *see also Maverick Tube Corp. v. Tosçelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1273 (Fed. Cir. 2017) ("{W}e explained that '{19 U.S.C. § 1677a(c)(1)(B)} defines a plain and simple rule: a duty drawback adjustment shall be granted when, but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty.'").

While "*Saha Thai* . . . should not be expanded to encompass all duty drawback adjustment calculations made by Commerce," it is instructive where, as here, the "particular facts, exemption program, and recordkeeping practices" utilize the matching principle. *Uttam Galva Steels Ltd. v. United States*, 311 F.Supp.3d 1345, 1355 (Ct. Int'l Trade 2018); *see also Uttam Galva Steels Ltd. v. United States*, 416 F.Supp.3d 1402, 1406 (Ct. Int'l Trade 2019), *aff'd*, 997 F.3d 1192 (Fed. Cir. 2021). Because Commerce has acknowledged that its cost- and sales-side adjustments must be reciprocal such that Commerce must exclude or include the same IPCs in calculating both adjustments, the matching principle therefore applies. *See Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final*

*Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023) ("*Rebar from Turkey AR20-21 Final Results*"), and accompanying Issues and Decision Memorandum at 37 ("{W}e agree with Çolakoğlu that the exempted duty cost ratio calculation included a certain IPC that was excluded from the sales-side duty drawback adjustment. As a result, *to be consistent with the sales-side* duty drawback adjustment, we determined that it is appropriate to exclude *this IPC* from the exempted duty cost calculation for the final results.") (emphases added). Therefore, Commerce's calculation must be remanded as not supported by substantial evidence or in accordance with law.

C. Commerce Unreasonably and Unlawfully Categorized Two of Çolakoğlu's Accounts Resulting in the Subsequent Recalculation of Medtrade's ISE Ratio

In addition to its unreasonable exclusion of IPCs from its duty drawback calculation, Commerce's categorization and subsequent recalculation of Medtrade's ISE ratio was also not based on substantial evidence. Specifically, Commerce's decision to categorize two accounts, [ ] and [ ], in calculating Medtrade's ISE ratio is (1) not supported by the record; and (2) not reasonably explained by the agency. *See* Prelim. Analysis Memo at 3, C.R. 16, P.R. 32.

First, with respect to [ ], in its initial questionnaire response, Çolakoğlu did not report or categorize [ ] as indirect selling expenses. *See* Sec. C QR at Exh. C-22, C.R. 133, P.R. 80. While Çolakoğlu inadvertently misstated in response to one question of a subsequent supplemental questionnaire that the [ ] were indirect selling expenses, supporting documentation within the supplemental questionnaire response, and its initial Section C Questionnaire Response, demonstrated that [ ] were financial expenses, not indirect selling expenses, and thus not part of the ISE ratio. *See* Çolakoğlu's Case Br. at 28–29, C.R. 5, P.R. 27; Sec. C QR, Exh. C-22 (row 92), C.R. 133, P.R. 80; Sec. A QR, Exh. A-16, C.R. 165-166,

P.R. 98. Further, in Medtrade's trial balance, the [ ] account is reported under "operating expenses." Sec. C QR, Exh. C-22, C.R. 133, P.R. 80. In reporting Medtrade's financial expenses ("INTEX"), Çolakoğlu reported financial income and expenses, as well as these operating expenses—and did not report these [ ] in the U.S. sales database. Simply put: record evidence clearly demonstrated that these [ ] were not sales related. By categorizing the verified INTEX expenses as in the ISE ratio, however, Commerce ignored this record evidence, artificially deflated the ISE ratio and artificially inflated the INTEX calculation.[3]

Second, Commerce failed to consider evidence detracting from its conclusion. Çolakoğlu explained to Commerce that [ ] is not indirect selling expense and directed Commerce to its reporting in response to the initial questionnaire, which showed that this account was a factor in calculating Medtrade's financial expense. *See* Çolakoğlu's Case Br. at 28–29, C.R. 5, P.R. 27 (citing, *inter alia*, Sec. C QR, Exh. C-22, C.R. 133, P.R. 80; Sec. A. QR, Exh. 16, C.R. 165-166, P.R. 98). Çolakoğlu explained that Commerce would be double-counting the amount in this account by including it in the ISE ratio because this account already factored into the INTEX calculation through the financial statements. *See id*. at 28–29 (citing, *inter alia*, Sec. A. QR, Exh. 16, C.R. 165-166, P.R. 98); *see also supra* note 3. In the *Final Results*, Commerce dismissed the possibility of double counting the, claiming that "it {was} unclear from the information on the record how Medtrade's expenses from the account at issue flowed to Çolakoğlu's financial statements." *IDM* at 22, ECF No. 19-4, P.R. 7. This claim is inaccurate. Çolakoğlu demonstrated that account [ ] is a line item in the "Total Other Income/Expenses" calculation of Medtrade's financial statement. *See* Sec. A QR, Exh. A-16, C.R. 165-166, P.R. 98

[3] Adding the accounts the accounts to the INTEX calculation would increase normal value, and adding them to the U.S. ISE ratio would lower EP or CEP.

(Medtrade's "Net Income/(Loss) After Tax" Statement). The account is clearly recorded as a financial expense—INTEX. *See* Sec. D QR at D-48 to D-49 & Exh. D-26, C.R. 118, 117, P.R. 77. Commerce ignored this evidence and did not elaborate as to how it was "unclear" that the expense account was not part of the financial statements. Commerce must address evidence that detracts from its determination—not just the evidence that it cites as supporting its conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). Commerce's failure to acknowledge this evidence, much less address it, requires a remand.

Third, Commerce recategorized the revenue associated with [ ], by removing it from the ISE ratio calculation. This revenue consisted of [ ] and has been reported in exactly the same manner in prior reviews, where Commerce accepted its treatment without objection. *See* Çolakoğlu's Case Br. at 30, C.R. 5, P.R. 27. Commerce has discretion to account for [ ] in AD/CVD proceedings. *Fla. Citrus Mut. v. United State*s, 515 F.Supp.2d 1324, 1336 (Ct. Int'l Trade 2007), *aff'd*, 550 F.3d 1105 (Fed. Cir. 2008) (finding that "the refunds to which the respondents were entitled were clearly included in U.S. price and therefore correctly adjusted for by Commerce"). This principle ensures that the calculation of U.S. price reflects the actual duty burden borne by the importer, thereby providing a fair comparison. In the [ ] account, Çolakoğlu recorded the [ ]. Again, Commerce accepted Çolakoğlu's reporting of this revenue. Indeed, in the 2022-2023 administrative review, Commerce verified the information submitted by Çolakoğlu and found no issues. Furthermore, excluding all revenues in this account from ISE is unwarranted, as the account contains various

types of revenues. Çolakoğlu provided a chart detailing the types of [ ], as shown in Çolakoğlu's response to the supplemental questionnaire. *See* Suppl. Secs. A–C QR, Exh. S1-47, C.R. 70, P.R. 49 (including [ ]).

Commerce must "treat similar situations in a consistent manner," and if it does deviate, it "must reasonably explain any deviation." While each review is a separate exercise of Commerce's authority, Commerce is not free to make different decisions when faced with substantially (or the exact same) facts and data without explaining why differing treatments are warranted. *See, e.g.*, *PT. Zinus Glob. Indon.*, 762 F.Supp.3d at 1272 (explaining that Commerce must "treat similar situations in a consistent manner," and if it does deviate, it "must reasonably explain any deviation") (citation omitted); *Calgon Carbon*, 487 F.Supp.3d at 1366 (remanding Commerce's use of a surrogate data to value a factor of production as inconsistent with treatment of the same data in prior administrative reviews); *Solarworld Ams., Inc. v. United States*, 182 F.Supp.3d 1372, 1379 (Ct. Int'l Trade 2016) (finding that Commerce did not provide an explanation for its disparate treatment even though Commerce may have had a reasonable basis for doing so). A bald assertion that "Commerce must rely on the information on the record in each case," *IDM* at 22, does not provide the requisite explanation, *see Mid Continent Steel & Wire, Inc. v. United States*, 551 F.Supp.3d 1360, 1366 (Ct. Int'l Trade 2021) (finding that Commerce's justification that "the record of each case stands on its own" did "not explain or identify any difference between the two cases that would lead to such different treatment") (citation omitted); *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F.Supp.3d 1347, 1358 (Ct. Int'l Trade 2019) (finding that "a bald assertion" did not constitute "a reasonable explanation").

Accordingly, the Court should remand the ISE calculation to Commerce with instructions to review the record and explain its reasoning.

D. <u>Commerce Unreasonably and Unlawfully Did Not Use the Date of Sale as Reported by Çolakoğlu Based on Contract Date and Primarily Used Shipment or Invoice Date for Çolakoğlu's U.S. Sales</u>

Fourth, Commerce unreasonably did not use the correct date of sale in its Final Determination and ignored record evidence submitted by Çolakoğlu.

Both the CIT and the Federal Circuit have consistently held that Commerce is under a duty to determine dumping margins as accurately as possible. *See, e.g.*, *NTN Bearing Corp.*, 74 F.3d at 1208; *Allied Tube & Conduit Corp. v. United States*, 127 F.Supp.2d 207, 218 (Ct. Int'l Trade 2000). To determine the export price, Commerce looks to when the merchandise is "first sold" to an unaffiliated customer. 19 U.S.C. § 1677a(a). However, the statute is silent as to the definition of "date of sale." As the CIT has confirmed, "{f}lexibility in Commerce's date of sale analysis is a natural corollary of Commerce's overarching obligation to determine dumping margins as accurately as possible." *Nucor Corp. v. United States*, 612 F.Supp.2d 1264, 1308 (Ct. Int'l Trade 2009).

Commerce's objective with respect to date of sale is to determine when all sales terms are finalized for purposes of reporting the correct universe of sales. In keeping with this purpose, Commerce's criteria for establishing the date of sale is the first point at which the terms are fixed, which is most commonly "when the seller demands payment (*i.e.*, when the sale is invoiced)." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27349 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*"); *see also* 19 C.F.R. § 351.401(i). However, Commerce may select an alternative date if "presented with *satisfactory evidence* that the material terms of sale are finally established on a date other than the date of invoice." *Preamble*, 62 Fed. Reg. at 27349 (emphasis added). Specifically, a party "must demonstrate that the material terms of sale were

'firmly' and 'finally' established on its proposed date of sale," rather than the date of invoice. *Tosçelik Profil ve Sac Endüstrisi A.S. v. United States* ("*Tosçelik Investigation Appeal I*"), 256 F.Supp.3d 1260, 1263 (Ct. Int'l Trade 2017) (citing *Preamble*, 62 Fed. Reg. at 27348-49). "The material terms generally include the terms of price, quantity, payment, and delivery." *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 756 F.Supp.3d 1312, 1318 (Ct. Int'l Trade 2025), *appeal docketed*, No. 25-1559 (Fed. Cir. Mar. 19, 2025) . The regulation goes on to provide that while Commerce "normally will use the date of invoice," it may instead "use a date other than the date of invoice if {Commerce} is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." *Id.* Simply put, while there is a presumption that the invoice date is the date of sale, this presumption is overcome if "the proponent of a different date produces satisfactory evidence that the material terms of sale were established on that alternate date." *Id.* (citing *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F.Supp.3d 1297, 1306 (Ct. Int'l Trade 2018)).

In the case where a party proposes that a date other than the invoice date better serves as the date of sale, it must show "that the administrative record *as a whole* demonstrates that the material terms were 'finally' and 'firmly' established on that date and that the agreement was not merely a preliminary agreement in an industry where renegotiation is common." *Kaptan*, 756 F.Supp.3d at 1321 (citing *Preamble*, 62 Fed. Reg. at 27348-49). Therefore, the question before the Court is whether Çolakoğlu "has pointed to sufficient evidence in the administrative record to show that Commerce's decision to use the invoice date as the date of sale was not supported by substantial evidence." *Id.*

Here, Çolakoğlu consistently reported the correct date of sale as the contract date, rather than the invoice date, as the date at which material terms of the sale were fixed. *See* Sec. C QR at

C-19 and Exh. C-6, C.R. 140, P.R. 81; Supp. A-C QR at Exh. S1-24, C.R. 75-76, P.R. 49. Specifically, Çolakoğlu provided that there were no changes to material terms, including the volume, price, delivery date, and latest date of shipment, between the contract and invoice outside of the agreed-upon tolerances. *See* Sec. C QR at Exh. C-6, C.R. 140, P.R. 81; Supp. A-C QR at S1-6 and Exh. S1-24, C.R. 85, 75-76, P.R. 49. In response to Commerce's Preliminary Determination, Çolakoğlu explained that its U.S. sales are produced pursuant to a customer's request for price and size breakdown and the allowed tolerance for quantity upon delivery, and that all negotiations related to material terms occur before the contract is created and finalized in Çolakoğlu's system. Therefore, due to the long lead time required to produce, pack, and ship each order, the sales order contract was the guiding document for all U.S. sales. *See* Çolakoğlu's Case Br. at 26 & n.120, C.R. 5, P.R. 27 (citing Sec. A QR at A-25 to A-26, A-28 to A-29, C.R. 170, P.R. 98).

Despite Çolakoğlu's demonstrated record evidence that in this specific review, the date of contract—not the date of invoice—is the proper date of sale, Commerce instead continued to use the invoice date. Commerce's decision, however, is not based on record evidence, as Commerce points to nowhere in the record to show that Çolakoğlu did not meet its burden. Commerce explained that it found that Çolakoğlu's initial Section C Questionnaire Response "covered only a portion of its total reported sales quantity" so that Commerce "requested further information from Çolakoğlu regarding this issue." *IDM* at 17, ECF No. 19-4, P.R. 7. Immediately after this sentence, Commerce provides that "{t}he information Çolakoğlu provided indicates that the material terms of sale changed after the contract date for certain of Çolakoğlu's POR U.S. sales; thus this information does not demonstrate that a reasonable mind had only one date of sale choice." *Id.* at 17-18 (footnote omitted). Notably absent from this conclusory statement, however,

is any citation to material terms that changed or any explanation as to what did not demonstrate that contract date was the proper date of sale. Continuing through all of Commerce's explanation, it only recites variations of the same conclusion, without any citations or explanation, that Çolakoğlu did not firmly establish the material terms of sale on the contract date.

Nowhere did Commerce explain why Çolakoğlu did not overcome its burden of showing that material terms did not change—because it could not. Instead, it relied on the presumption of the invoice date, the deference afforded to its findings, and conclusory statements that the contract date was not binding. *IDM* at 12-14, ECF No. 19-4, P.R. 7.

While the Court must grant Commerce deference, it must also consider whether Commerce's decision was reasonable based on the record as a whole. Here, it cannot be found that Commerce reviewed the record as a whole where it provided no specific instances where material terms changed after the contract, and where it did not explain its decision.

E. Commerce Acted Contrary to its Statutory Mandate to Calculate an Accurate Dumping Margin for Çolakoğlu.

Commerce determinations must "articulate a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Ark-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted) (citation omitted); *see also Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007) ("{A}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."). In the *Final Results*, Commerce does not address the stark deviation in Çolakoğlu's calculated dumping margin, based on no substantial changes in the facts relevant to Çolakoğlu's production process or use of the Turkish duty drawback system. *See IDM* at 11-12, ECF No. 19-4, P.R. 7 (discussing only how Commerce's determination to "limit duty drawback to the actual duty liability extinguished for a Turkish company during the POR" is purportedly consistent with the law and Commerce

precedent). However, the reality is Commerce's calculation of duty drawback in this review results in an inaccurate dumping margin, as evidence by the history of the rebar from Turkey proceedings.

Çolakoğlu has participated in Commerce's investigation and reviews of rebar from Türkiye since the investigation, quite often as a mandatory respondent. Indeed, Çolakoğlu has been a cooperating mandatory respondent in the following reviews, all of which Çolakoğlu received a calculated rate of less than 2%:

| Review Period | Çolakoğlu's Margin | Citation |
|---|---|---|
| 2022-2023 | 1.13% | *Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 21275, 21276 (Dep't Commerce May 19, 2025). |
| 2021-2022 | 0.00% | *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of the Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 89663, 89663 (Dep't Commerce Dec. 28, 2023). |
| 2020-2021 | 1.13% | *Rebar from Turkey AR20-21 Final Results*, 88 Fed. Reg. at 7942. |
| 2019-2020 | 0.00% | *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No-Shipments; 2019-2020*, 87 Fed. Reg. 7118, 7119 (Dep't Commerce Feb. 8, 2022); *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No-Shipments; 2019-2020; Correction*, 87 Fed. Reg. 10334 (Dep't Commerce Feb. 24, 2022). |

Çolakoğlu was not selected as an individually-examined mandatory respondent in the remaining reviews of rebar from Türkiye, *i.e.*, the 2018-2019 review, 2017-2018 review, or the investigation. *See Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021); *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg.

15765 (Dep't Commerce Mar. 19, 2020); *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 23192 (Dep't Commerce May 22, 2017).

As evidenced by the record in this case, supported by the five immediately preceding reviews, Çolakoğlu has not changed its production or selling processes in such a way that would result in an AD duty eighteen times higher than any of Çolakoğlu's calculated rates over five administrative review cycles.

Commerce's action is "arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA Inc.*, 263 F.3d at 1382 (internal quotations omitted) (citation omitted) (alteration in original). "{C}onsistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant." *DAK Americas LLC v. United States*, 456 F.Supp.3d 1340, 1355 (Ct. Int'l Trade 2020) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994)). Commerce's *Final Results* neither articulate "a rational connection between the facts found and the choice made," nor do they provide sufficient reason for "treating similar situations differently." *Bowman*, 419 U.S. at 285 (internal quotations omitted) (citation omitted); *see also SKF USA Inc.*, 263 F.3d at 1382. Commerce's *Final Results* overall, but particularly with respect to the duty drawback analysis, are inconsistent with over five years of precedent in the Turkish Rebar cases, and precedent established in the various other Turkish antidumping duty cases. *See DAK*, 456 F.Supp.3d at 1355-56.

## VII. CONCLUSION

For the reasons set forth above, Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. request that this Court:

1. Hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law with respect to (a) the limitation of Çolakoğlu's duty drawback adjustment to IPCs closed during the POR; (b) the inconsistent treatment of IPCs in the sales-side and cost-side duty drawback adjustments; (c) the categorization of two of Çolakoğlu's accounts in calculating Medtrade's ISE ratio; (d) the date of sale for Çolakoğlu's U.S. sales; (e) Commerce's unexplained departure from previous administrative reviews in calculating an aberrational margin for Çolakoğlu.
2. Remand the *Final Results* to Commerce with instructions to reconsider each of these issues consistent with the Court's opinion and to recalculate Çolakoğlu's antidumping duty margin as appropriate; and
3. Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Jessica R. DiPietro_**
Jessica R. DiPietro
Leah N. Scarpelli
Matthew M. Nolan
Tyler J. Kimberly
Chelsea J. Burkhart

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 350-3622
E-mail: jessica.dipietro@afslaw.com

*Counsel for Çolakoğlu Metalurji A.S. &*
*Çolakoğlu Dis Ticaret A.S.*

November 10, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiffs' Brief in Support of Their 56.2 Motion for Judgment on the Agency Record filed on November 10, 2026 in CIT Appeal No. 26-2934 complies with the word limitation requirement. The word count for Plaintiffs' Brief, as computed by ArentFox Schiff LLP's word processing system, is 11,507.

**/s/ Jessica R. DiPietro**
Jessica R. DiPietro

*Counsel for Çolakoğlu Metalurji A.S. &*
*Çolakoğlu Dis Ticaret A.S.*